**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————————
**CHESTER MATLOSZ,**

                        Plaintiff,

            - against –

**J.P. MORGAN CHASE and**
**RAM DHINDWHAL,**

                        Defendants.
————————————————————————————————


**03 Civ. 6235 (JGK)**

**OPINION & ORDER**


**JOHN G. KOELTL, District Judge:**

    The plaintiff, Chester Matlosz, brought this action
against his former employer, JPMorgan Chase Bank ("JPMorgan
Chase" or "Chase"), incorrectly named as J.P. Morgan Chase in
the caption, and a Chase Senior Vice-President, Ram Dhindhwal
("Dhindhwal"), incorrectly named as Ram Dhindwhal in the
caption, seeking compensatory and punitive damages for
retaliatory discharge, discriminatory conduct, slander, and
breach of contract.

    The plaintiff asserts (1) claims under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging
that he was discharged in retaliation for his complaining
about discriminatory treatment, was subjected to a hostile

work environment, and was discriminated against and harassed based on sex; (2) claims of retaliation and discrimination under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 et seq., and Whitman Executive Order No. 106; (3) slander and slander per se claims alleging that Dhindhwal falsely accused the plaintiff of being a sexual harasser; and (4) a breach of contract claim alleging that his actions were protected by the Chase Employee Relations Manual ("Manual").[1]

The defendants have moved for summary judgment. They argue, among other things, that the plaintiff cannot show that he was subjected to discrimination or retaliation based on any protected classification, that the claims of slander and slander per se are precluded by the doctrine of qualified privilege, and that the Manual did not alter the plaintiff's status as an at will employee.

I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[1] The plaintiff also brought claims of retaliation, hostile work environment, retaliatory discharge, and sexual discrimination in violation of the New York Human Rights Law, N.Y. Exec. Law § 296, and an intentional infliction of emotional distress claim. (Compl. ¶¶ 61-83, 101-05.) However, these claims--IV, V, VI, and X--were withdrawn by the plaintiff. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 1.)

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Consol. Edison, Inc. v. Northeast Utilities, 332 F. Supp. 2d 639, 642 (S.D.N.Y. 2004).

Summary judgment is appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the

burden of proof at trial.  See Cleveland v. Policy Mgt. Sys.
Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322;
Powell v. Nat. Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir.
2004).  In determining whether summary judgment is
appropriate, a court must resolve all ambiguities and draw all
reasonable inferences against the moving party.  See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587 (1986) (citing United States v. Diebold, Inc., 369
U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.
Summary judgment is improper if there is any evidence in the
record from any source from which a reasonable inference could
be drawn in favor of the nonmoving party.  See Chambers v.
T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If
the moving party meets its initial burden of showing a lack of
a material issue of fact, the burden shifts to the nonmoving
party to come forward with "specific facts showing that there
is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The
nonmoving party must produce evidence in the record and "may
not rely simply on conclusory statements or on contentions
that the affidavits supporting the motion are not credible."
Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.
1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d
Cir. 1998); Singh v. New York City Off-Track Betting Corp.,

4

No. 03 Civ. 5238, 2005 WL 1354038, at *1 (S.D.N.Y. June 8,
2005); Consol. Edison, 332 F. Supp. 2d at 643.

II.

A.

Unless otherwise noted, there is no dispute as to the
following facts.  The plaintiff, a resident of New Jersey, was
born on August 4, 1958.  (Defs.' Local Civil Rule 56.1 Stmt.
("Defs.' Stmt."), ¶¶ 5-6; Pl.'s Local Civil Rule 56.1 Stmt.
("Pl.'s Stmt."), ¶¶ 5-6.)  He began working for Chase as a
Vice President and Senior Project Manager on January 8, 2001,
under the supervision of Thomas Radkiewicz, Director of
Project Management, who himself reported to Robert Rupp, then
Chief Technology Officer and Senior Vice President.  (Defs.'
Stmt. ¶¶ 8-9, 11; Pl.'s Stmt. ¶¶ 8-9, 11.)

There is some confusion as to the initial significant
contacts between the plaintiff and Dhindhwal, then Manager of
Application Development and a Senior Vice President reporting
to Rupp.  (See, e.g., Defs.' Stmt. ¶ 13; Pl.'s Stmt. ¶ 13.)
Generally, a series of events between March 2001 and June 2001
led to friction developing between the plaintiff and
Dhindhwal.  (Defs.' Stmt. ¶ 13; Pl.'s Stmt. ¶ 13.)  For
example, during that time period, the plaintiff was asked by
Radkiewicz to produce a report on Dhindhwal's claim that
Dhindhwal could complete a particular project by June 30,

2001.  (Defs.' Stmt. ¶¶ 14-15; Pl.'s Stmt. ¶¶ 14-15.)  The
plaintiff concluded that Dhindhwal's projection was too
optimistic.  (Defs.' Stmt. ¶ 16; Pl.'s Stmt. ¶ 16.)  At a
meeting on April 5, 2001, attended by the plaintiff,
Dhindhwal, Rupp, and Radkiewicz, among others, Dhindhwal got
upset that his judgment was being questioned by the plaintiff,
a new employee.  (Defs.' Stmt. ¶¶ 18-19; Pl.'s Stmt. ¶¶ 18-
19.)  At the end of the meeting, Dhindhwal refused to shake
the plaintiff's hand until told to do so by Rupp.  (Defs.'
Stmt. ¶ 20; Pl.'s Stmt. ¶ 20.)

    In August 2002, Rupp conducted a staff meeting, attended
by Radkiewicz, Dhindhwal, and himself, among others, but not
the plaintiff (the "August 2002 meeting").  (Defs.' Stmt. ¶¶
22, 25; Pl.'s Stmt. ¶¶ 22, 25.)  Dhindhwal allegedly made
accusations at this meeting that some women had potential
sexual harassment charges pending against the plaintiff.
(Defs.' Stmt. ¶¶ 23-24; Pl.'s Stmt. ¶¶ 23-24.)  Radkiewicz
testified at his deposition that Dhindhwal said that two women
had personally contacted Dhindhwal and told him that the
plaintiff was harassing them.  (Dep. of Thomas Radkiewicz,
dated May 25, 2004 ("Radkiewicz Dep."), at 63, attached as Ex.
4 to Aff. of Adolph D. Seltzer ("Seltzer Aff.").)  On the
other hand, Dhindhwal testified at his deposition that he was
actually told of the potential sexual harassment by Burhan

Mahmoud, a male who worked for the plaintiff. (Dep. of Ram G. Dhindhwal, dated July 19, 2004[2] ("Dhindhwal Dep."), at 119-24, attached as Ex. 3 to Seltzer Aff.) Within a few days of the meeting, Radkiewicz called the plaintiff and informed him of Dhindhwal's accusations. (Defs.' Stmt. ¶ 23; Pl.'s Stmt. ¶ 23.)

After learning what was said about him at the August 2002 meeting, the plaintiff contacted Niki Lombardo of Human Resources ("HR") to complain about Dhindhwal's behavior. (Defs.' Stmt. ¶¶ 26-27; Pl.'s Stmt. ¶¶ 26-27.) While on the phone with Lombardo, the plaintiff did not explicitly complain of discrimination based on age or gender; however, there is disagreement between the parties whether the plaintiff told Lombardo that he felt he was being sexually harassed. (Defs.' Stmt. ¶¶ 30-31, 34; Pl.'s Stmt. ¶¶ 30-31, 34.) In his deposition testimony, the plaintiff testified that he did not complain that he was "being discriminated against," but "everything [he] said to [Lombardo] would lead her to the conclusion [Dhindhwal] was discriminating against [him]" and that his complaint was not about a "personality dispute." (Dep. of Chester E. Matlosz, dated July 22, 2004 ("Pl.'s Dep."), at 126-27, attached as Ex. 2 to Seltzer Aff.) At his deposition, the plaintiff, when asked if he complained to

_____

[2] The transcript is incorrectly dated July 19, 2001.

Lombardo that he was being sexually harassed, responded that he "was not being sexually harassed." (Id. at 126.) Moreover, Lombardo never replied to the plaintiff that Dhindhwal's actions or statements constituted sexual harassment. (Id. at 138.)

Thereafter, Lombardo organized a four-way telephone conference call between Dhindhwal, Radkiewicz, the plaintiff, and herself. (Defs.' Stmt. ¶ 38; Pl.'s Stmt. ¶¶ 25.d, 38.) During this telephone call, Dhindhwal was confronted by the plaintiff and Radkiewicz and eventually admitted to making the above-described statements about Matlosz at the August 2002 meeting. (Pl.'s Stmt. ¶¶ 40.e, 40.g; see Defs.' Stmt. ¶¶ 40-41.) When asked who the women who had complained were, however, Dhindhwal refused to provide their names. (Pl.'s Stmt. ¶ 40.f.) During the phone call, the plaintiff told Lombardo that he "had no intention of leaving Chase[,] . . . . wanted it documented [that Dhindhwal was] bugging [him], he is harassing [him]," and would drop his complaint of harassment if Dhindhwal would stop trying to remove him from Chase. (Pl.'s Dep. at 135-36.) Dhindhwal then allegedly apologized and said that he would let the matter drop and would not "pursue" the plaintiff. (Pl.'s Dep. at 136; Defs.' Stmt. ¶ 42; Pl.'s Stmt. ¶ 42.)

On November 6, 2002, the plaintiff was removed from his position as Senior Project Manager and was assigned to the EDS project as an individual contributor. (Defs.' Stmt. ¶¶ 43, 46; Pl.'s Stmt. ¶¶ 43, 46.) The plaintiff was allegedly taken out of his role as Project Manager because of business complaints, although the plaintiff claims that this excuse was merely pretextual. (Defs.' Stmt. ¶¶ 44-45; Pl.'s Stmt. ¶¶ 44, 44.a, 44.c, 44.f, 44.h, 44.i; see Pl.'s Stmt. ¶ 43 (noting that the plaintiff had, prior to his reassignment, been commended for his work as a Senior Project Manager and his ability to lead projects for Chase's "business clients").) The plaintiff's new position was allegedly a step down from his previous work: he managed a project worth $500,000 instead of projects totaling around $20,000,000 and was no longer in charge of twenty people. Moreover, completing the new position's tasks allegedly required only a couple of hours of the plaintiff's time and was not much of a challenge. (Pl.'s Stmt. ¶¶ 44.b, 45.e.) After his reassignment, the plaintiff applied for around thirty positions at Chase through HR. (Defs.' Stmt. ¶ 48; Pl.'s Stmt. ¶ 48.) The plaintiff was rejected for all of the positions and believed that he was being "blackballed." (Pl.'s Stmt. ¶ 49.) However, in his deposition testimony, he said that he did not know why his applications were being rejected, had no knowledge of the

mechanism involved for the rejections, and had no idea whether his applications were rejected by people in contact with Dhindhwal, Rupp, or Radkiewicz. (Defs.' Stmt. ¶¶ 49-50; Pl.'s Dep. at 51, 143, 146, 148-49.)

The EDS project concluded in late January 2003, and on February 9, 2003, the plaintiff was again reassigned, this time to work as an Enterprise Architect for Kuldeep Tuteja, a Chase President in Application Integration. (Defs.' Stmt. ¶ 51; Pl.'s Stmt. ¶ 51.) Around the same time, however, Tuteja and his group were reassigned to Application Development, reporting to Dhindhwal; because Dhindhwal allegedly believed that the plaintiff was not qualified for his new position as Enterprise Architect, the plaintiff was prevented from following Tuteja to Application Development. (Defs.' Stmt. ¶¶ 52-53; Pl.'s Stmt. ¶¶ 52-53, 54.a, 54.a.2, 54.c.) The plaintiff alleges that Dhindhwal told Tuteja to drop the plaintiff from the group because the plaintiff had reported Dhindhwal's false accusation of sexual harassment to HR in August 2002. (Pl.'s Stmt. ¶ 54.h.) After he was denied the position in Tuteja's group, Matlosz believed that he was in limbo and was confused as to whom he was supposed to report to. (Defs.' Stmt. ¶ 54; Pl.'s Stmt. ¶¶ 54, 54.j.) The plaintiff also testified at his deposition that after his

first reassignment in November 2002, he generally felt isolated and intimidated. (Pl.'s Dep. at 166-67.)

As a result of his isolation and confusion, the plaintiff sent Karen Van Breda Kolff and David Bess, both working in HR, an e-mail on February 26, 2003 (the "February 2003 complaint"), detailing his employment situation and his suspicion that he was being mistreated because of "the original harassment charges I brought forward when [Dhindhwal] vocalized I was going to be a problem and have a sexual harassment suit brought against me." (E-mail, dated Feb. 26, 2003 ("Feb. 26 E-mail"), attached as Ex. K, ¶ 3, to Defs.' Stmt.; Defs.' Stmt. ¶ 58; Pl.'s Stmt. ¶ 58.) Moreover, in the e-mail, the plaintiff noted that he "was concerned because I am a white male, over 40" and that "others in my category . . . are experiencing similar [poor performer rankings in employee evaluations.]" (Id.)

On March 6, 2003, after failing to hear a response to his February 2003 complaint, the plaintiff sent another e-mail complaint, this time to Carl Haughton, head of HR for Chase (the "March 2003 complaint"). (Defs.' Stmt. ¶ 60; Pl.'s Stmt. ¶ 60.) This Complaint included an attachment of the February 2003 complaint and explained that the plaintiff felt he had been "harassed by Bob Rupp and Ram Dhindhwal" and "I believe this harassment has lead [sic] to a potential case of age

discrimination . . . ." (E-mail, dated Mar. 6, 2003 ("Mar. 6 E-mail"), attached as Ex. K, ¶ 18, to Defs.' Stmt.)

In the same time period as the plaintiff's two 2003 complaints, e-mails and a memorandum were being sent between Van Breda Kolff and Radkiewicz about the plaintiff's 2002 Annual Performance Evaluation. (Defs.' Stmt. ¶¶ 55-57; Pl.'s Stmt. ¶¶ 55-57.) There is some disagreement as to when the version of the memorandum and report that were critical of the plaintiff's performance were prepared, and the plaintiff argues that the evaluation was a pretextual instrument calculated to facilitate his termination. (Defs.' Stmt. ¶¶ 55-57; Pl.'s Stmt. ¶¶ 57, 57.f.)

On March 6, 2003, a few hours before the plaintiff wrote the March 2003 complaint to Haughton, Van Breda Kolff sent a proposed reduction in force for the plaintiff to Greg Trojanowski, a Vice President with Corporate Employee Relations for Chase, recommending the elimination of the plaintiff's position "[d]ue to his poor communication skills" and the fact that clients did not want to deal with him. (Defs.' Stmt. ¶¶ 59-60.) The plaintiff alleges that Van Breda Kolff's reasoning was pretextual, that his position was not eliminated but that he was discharged in retaliation for his first complaint to HR about Dhindhwal's false accusations against him. (Pl.'s Stmt. ¶¶ 59.a, 61.) On March 14, 2003,

the plaintiff was informed by Van Breda Kolff that his

position was being eliminated.  (Defs.' Stmt. ¶ 62; Pl.'s

Stmt. ¶ 62.)


                              B.

     The plaintiff testified at his deposition that he was

subject to the Chase Employment At Will Policy Guide (the

"Guide") and did not have a written contract of employment.

(Pl.'s Dep. at 111-12.)  The Guide states that:

> JPMorgan Chase reserves the right, whether in an
> individual situation or more generally, to interpret,
> supplement, vary, change, suspend or eliminates any of
> these policies or programs and to institute new ones at
> any time, with or without notice.  JPMorgan Chase, like
> other employers, hires and employs under terms known as
> employment at will.  Employment at will means that
> JPMorgan Chase may alter the terms of your employment and
> either you or JPMorgan Chase may terminate your
> employment at any time and for any reason or for no
> reason, with or without notice.  No officer or other
> employee has authority to alter the employment at will
> relationship, orally or in writing.  This Guide does not
> constitute or create an employment contract, establish
> rights, privileges or benefits of employment, or
> establish any job guarantee or term of employment.

(Employment At Will Policy Guide, dated Jan. 1, 2001

("Guide"), attached as Ex. E-9 to Defs.' Stmt.)(emphasis in

original).  However, the plaintiff alleges that his at will

status was modified by the Employee Relations Manual (the

"Manual").  (Pl.'s Stmt. ¶ 10.)  The Manual describes a policy

whereby individuals will not be discriminated against or

harassed because of race, color, sex, age, or other protected status under any law. (Manual at 2, attached as Ex. 8-44 to Seltzer Aff.) The Manual also provides that supervisors are required to report harassment and employees who complain about harassment will not be subjected to coercion, intimidation, or retaliation. (Id. at 5-6.)

III.

In his First Claim, the plaintiff alleges that, because he complained to HR in August 2002 and then again in February 2003,[3] he was terminated from his employment at Chase and, thus, seeks relief under Title VII. Title VII prevents employers from retaliating or discriminating against an employee because the employee opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, the plaintiff must demonstrate that (1) he was engaged in a protected activity; (2) the defendant was aware of this activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action, that is, a retaliatory motive played a part in the adverse

---

[3] The plaintiff stated at argument that he was not making a retaliation claim based on his March 6, 2003, e-mail. (Tr., dated June 30, 2005, at 42.)

employment action.  See Hill v. Citibank Corp., 312 F. Supp.
2d 464, 477-78 (S.D.N.Y. 2004).

Under the familiar burden-shifting analysis of McDonnell
Douglas Corp. v. Green, 411 U.S. 792 (1973), once the
plaintiff makes such a showing, the burden of production
shifts to the defendant to put forth legitimate
nondiscriminatory or nonretaliatory reasons for its actions,
at which point the plaintiff has the opportunity to
demonstrate that the defendant's explanations are false and
that the retaliation and/or discrimination was a motivating
factor in the adverse employment action.  See, e.g., Van Zant
v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996).
To survive a motion for summary judgment, the plaintiff is
"obliged to produce not simply some evidence, but sufficient
evidence to support a rational finding that the legitimate,
nondiscriminatory reasons proffered by the employer were
false, and that more likely than not [discrimination] was the
real reason for the discharge."  Id. (internal citation and
quotation marks omitted) (alteration in original).

The ultimate burden of persuading the trier of fact that
the defendant intentionally discriminated or retaliated
against the plaintiff remains at all times with the plaintiff.
See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253
(1981); see also Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 143 (2000); Fisher v. Vassar Coll., 114 F.3d
1332, 1336 (2d Cir. 1997).  The Court of Appeals for the
Second Circuit has instructed that in determining whether the
plaintiff has met this burden, a court is to use a "case by
case" approach that evaluates "the strength of the plaintiff's
prima facie case, the probative value of the proof that the
employer's explanation is false, and any other evidence that
supports [or undermines] the employer's case."  James v. N.Y.
Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000) (alteration in
original) (quoting Reeves, 530 U.S. at 148-49); see also
Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000).  Although
summary judgment must be granted with caution in Title VII
actions "where intent is genuinely in issue, . . . summary
judgment remains available to reject discrimination claims in
cases lacking genuine issues of material fact."  Chambers v.
TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994); see also
Hill, 312 F. Supp. 2dat 477-78.


                              A.

     The defendants move for summary judgment and argue that
the plaintiff's complaint following the August 2002 meeting
never alleged that the plaintiff was sexually harassed or
discriminated against because of a protected characteristic.
The defendants argue that the August 2002 complaint was

therefore not opposition to an unlawful employment practice. Therefore, the defendants argue, any actions taken against the plaintiff because of that complaint were not retaliation for a protected activity.

The record indicates that the August 2002 complaint did not allege discrimination because of age, sex, race, or any other protected characteristic, and the plaintiff testified as much in his deposition.[4]  (Pl.'s Dep. at 126-29.)  The plaintiff presents no evidence that Dhindhwal made his allegedly false charges at the August 26, 2002, meeting because of the plaintiff's age, sex, race, or any other protected characteristic, and there is no basis for concluding that the plaintiff's complaint to HR constituted such an allegation.  Rather, any harassment of the plaintiff by Dhindhwal appears to have been the result of personal friction between Dhindhwal and the plaintiff resulting in part from the plaintiff's criticism of Dhindhwal at the April 2001 meeting.

Relying on dicta from McDonnell v. Cisneros, 84 F.3d 256, 259-60 (7th Cir. 1996), the plaintiff argues that Dhindhwal's allegations that women had complained to Dhindhwal of sexual harassment by the plaintiff constitute sexual discrimination.

_____

[4] Opposition to unlawful employment practices based on age is protected under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(d), but the parties have not sought to draw a distinction between the protection afforded by ADEA and that afforded by Title VII.

In <u>McDonnell</u>, the Court of Appeals for the Seventh Circuit
stated in dicta that:

> a male supervisor for whom life is made unbearable by
> baseless accusations that he is extorting sexual favors
> from his subordinates could also be thought a victim of
> sexual harassment.  Such accusations would be based on
> the fact that he was a man--that is, on the difference in
> sex between him and the persons he was accused of
> abusing.

<u>Id.</u> at 260.  The plaintiff claims that by complaining to
Lombardo about Dhindhwal's comments at the August meeting, the
plaintiff was complaining of sexual harassment against him.
The facts in this case, however, do not rise to the level of
the scenario in <u>McDonnell</u>.  Dhindhwal made no allegations
during the August 2002 meeting that the plaintiff was
"extorting sexual favors" from his subordinates, but only said
that the plaintiff had potential sexual harassment charges
pending against him.  More importantly, the plaintiff did not
allege in his August 2002 complaint that he was treated
differently from any other employee because of his sex--
indeed, he actually testified at his deposition that he was
not discriminated against because of sex.  (Pl.'s Dep. at
129.)

The accusation by the plaintiff at the August 2002
meeting is more akin to the facts in <u>Balazs v. Liebenthal</u>, 32
F.3d 151 (4th Cir. 1994).  In <u>Balazs</u>, where an employee was
demoted after being falsely accused of sexual harassment, the

18

Court of Appeals for the Fourth Circuit held that "[a]n allegation that he was falsely accused of conduct which, if true, might have given rise to a claim of employment discrimination based on sex by someone else in no way states a cause of action that plaintiff himself was a victim of discrimination based on his sex." Balazs, 32 F.3d at 155; see Kelly v. Market USA, No. 01-4169-SAC, 2002 WL 1334830, at *1 (D. Kan. May 14, 2002) (stating that false accusations of sexual harassment do not constitute a violation of Title VII); Kipnis v. Baram, 949 F. Supp. 618, 623 (N.D. Ill. 1996). Indeed, the court in Balazs found that "nowhere in any of the several charges filed by [the] plaintiff . . . is it alleged that he was treated differently from any other employee, male or female, because of his sex." Balazs, 32 F.3d at 155. The record in this case supports the same conclusion. Because, in August 2002, the plaintiff only complained of harassment generally and failed to complain of discriminatory treatment based on a protected characteristic, the August 2002 complaint is not protected activity under Title VII and cannot give rise to a claim of retaliatory discharge.

Accordingly, the plaintiff fails to satisfy the elements of a prima-facie case of retaliation based on the August 2002 complaint.

B.

The plaintiff also argues that he was discharged in retaliation for his February 2003 complaint to HR.[5]  In his February 2003 e-mail, the plaintiff stated that because of his sex and age--"male, over 40"--he was concerned that he was ranked as a poor performer even though he had allegedly successfully achieved the objectives required of him.  (Feb. 26 E-mail, ¶ 3.)  He also expressed concern that "others in [his] category [were] experiencing similar rankings," implying that he was being discriminated against based on his sex and age.  (Id.)  Such statements may be found by a reasonable jury to be informal complaints of discrimination based on age and gender.  See Bampoe v. Coach Stores, Inc., 93 F. Supp. 2d360, 372 (S.D.N.Y. 2000) (noting that, under Title VII, informal complaints, such as complaints to management, constitute protected activities).  Indeed, the defendants conceded that the February 2003 e-mail is a protected activity, (Tr., dated June 30, 2005, at 13.), and only disputed the causal connection between the February 2003 e-mail and the plaintiff's termination.

Because the plaintiff's February 26, 2003 e-mail to HR is a protected activity, the first prong of the prima facie test is satisfied.  Moreover, because, at most, three weeks passed

_____

[5] As explained above, the plaintiff stated at argument of the motion that he was not making a retaliation claim based on his March 6, 2003, e-mail. (Tr., dated June 30, 2005, at 42.)

between the plaintiff's February 26, 2003 e-mail and the
plaintiff's discharge, there is enough evidence of a causal
connection between the protected activity and the discharge to
survive a motion for summary judgment.  See Gorman-Bakos v.
Cornell Coop. Extension of Schenectady County, 252 F.3d 545,
554-55 (2d Cir. 2001) (surveying cases); see also Clark County
Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam)
(requiring "very close" proximity in time (internal citation
and quotation marks omitted)).

There are issues of fact as to whether Van Breda Kolff's
proposed reduction in force was the reason for the plaintiff's
discharge and whether the plaintiff's complaints caused, at
least in part, his termination.  The plaintiff has presented
enough evidence for a jury to find that the plaintiff was
terminated in retaliation under Title VII, and that those
involved in the termination were engaged in an effort to
develop a pretextual basis for the discharge.  Accordingly,
the defendants' motion for summary judgment on the plaintiff's
Title VII retaliation claim (Claim I) must be denied.


IV.

The plaintiff's Second Claim is entitled "Retaliation and
Hostile Work Environment Harassment Claim in Violation of

Title VII." The plaintiff argues that the unfounded August 2002 charge by Dhindhwal was a "form of sexual harassment." (Compl. ¶ 51.) The plaintiff also argues that, after he complained about that charge, he was subjected to a "hostile work environment." (Compl. ¶ 52.)

To the extent that the plaintiff is complaining about retaliation for the charge he made against Dhindhwal in August 2002, for the reasons explained above, that was not protected activity and thus, any adverse actions taken against because of that complaint were not actionable.

In any event, the plaintiff has failed to show that he was subjected to any hostile work environment. A hostile work environment can constitute an adverse employment action for the purposes of establishing a prima facie case of employment discrimination under Title VII. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-16 (2002); Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 446 (2d Cir. 1999). To establish a prima facie case of hostile work environment, a plaintiff must show: (1) discriminatory harassment that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). The first element of

the prima facie case must be established by a showing that
"the workplace was so severely permeated with discriminatory
intimidation, ridicule, and insult that the terms and
conditions of [the plaintiff's] employment were thereby
altered." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.
2002); Fairbrother v. Morrison, 412 F.3d 39, 48-49 (2d Cir.
2005); Garvin v. Potter, 367 F. Supp. 2d548, 566 (S.D.N.Y.
2005); Singh, 2005 WL 1354038, at *11.

The plaintiff has made no showing that he was subjected
to discrimination, intimidation, ridicule, and insults.
Moreover, the plaintiff has failed to show that any of the
conditions of employment about which he complains—such as his
job transfer—was the result of discrimination based on his
gender or age.  Therefore summary judgment is granted
dismissing the plaintiff's second cause of action.


V.

In his Third Claim, the plaintiff alleges that he was
sexually harassed and discriminated against when Dhindhwal
made allegedly false accusations that female employees had
potential sexual harassment complaints against the plaintiff.

Dhindhwal's charge against the plaintiff does not
establish an independent basis for liability.  For the reasons

already explained, there is no evidence that the charge was made against the plaintiff because of the plaintiff's sex.

Moreover, the existence of that single incident did not rise to the level necessary to constitute a hostile work environment. "[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinary severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment. To decide whether the threshold has been reached, courts examine the case-specific circumstances in the their totality and evaluate the severity, frequency, and degree of the abuse." Alfano, 294 F.3d at 374 (internal citation and quotation marks omitted). In this case, the single incident of an allegedly unfounded charge was addressed promptly by senior management and ended in an apology to the plaintiff. It cannot be found that this incident was so severe as to constitute a hostile work environment. Summary judgment is granted dismissing the plaintiff's third cause of action.

## VI.

In the Seventh Claim, the plaintiff asserts claims analogous to his Title VII claims under LAD, N.J.S.A. 10:5-1 et seq. The legal standards to establish a retaliatory discharge, harassment, discrimination, or hostile work

environment claim under LAD are substantially the same as those under Title VII.  See, e.g., Dixon v. Rutgers, The State Univ. of N.J., 541 A.2d 1046, 1051-52 (N.J. 1988); Clowes v. Terminix Int'l, Inc., 538 A.2d 794, 805 (N.J. 1988); Turner v. Wong, 832 A.2d 340, 354-55 (N.J. Super. Ct. App. Div. 2003); Donofry v. Autotote Sys., 795 A.2d 260, 269 (N.J. Super. Ct. App. Div. 2001); Giammario v. Trenton Bd. Of Educ., 497 A.2d 199, 202 (N.J. Super. Ct. App. Div. 1985); cf. Kluczyk v. Tropicana Prods., Inc., 847 A.2d 23, 30-31 (N.J. Super. Ct. App. Div. 2004).  Accordingly, and as explained above with regard to the Title VII claims, the defendants' motion for summary judgment is granted on the plaintiff's LAD claims of sexual harassment, discrimination, and hostile work environment, but the portion of the plaintiff's LAD claim of retaliatory discharge based on the plaintiff's February 2003 complaint remains.

Moreover, the defendants' motion for summary judgment dismissing those parts of the plaintiff's Seventh Claim based on the Whitman Executive Order No. 106 is also granted.  The plaintiff failed to reply to the defendants' assertion that the Whitman Order only applies to "State departments, commissions, State colleges, and authorities."  (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J., at 2 n.4.)  The claim is therefore abandoned.  Moreover, the defendants'

assertion is correct.  <u>See</u> N.J. Admin. Code Exec. Order No.

106 (1999); N.J. Model Procedures for Internal Complaints

Alleging Discrimination, Harassment or Hostile Environments in

the Workplace, *available at*

<u>http://www.state.nj.us/personnel/EEO/POP-</u>

<u>UPS/EEO_internal_complaint.htm</u> (referring to model procedures

for New Jersey state departments, commissions, state colleges,

and authorities).  Accordingly, summary judgment for the

defendants is granted on all of the plaintiff's claims under

Whitman Executive Order No. 106.


VII.

   In Counts Eight and Nine, the plaintiff asserts claims of

slander per se and slander arising out of Dhindhwal's comments

in August 2002.  The defendants counter that Dhindhwal's

alleged statements are protected by qualified privilege and

that the statements do not fall under the doctrine of slander

per se.[6]

   In order to prove slander, a plaintiff must establish

that Dhindhwal made a defamatory statement of fact concerning

the plaintiff, which was false, and was communicated to a

person or persons other than the plaintiff.  <u>Govito v. W.</u>

<u>Jersey Health Sys., Inc.</u>, 753 A.2d 716, 722 (N.J. Super. Ct.

––––––––––––––––––––––
[6] The parties agree that New Jersey law applies to these claims.

App. Div. 2000). A defamatory statement is one that tends to harm the reputation of the plaintiff or to lower the plaintiff in the estimation of the community or deter third persons from associating or dealing with him. Id. Slander per se "is limited to defamatory statements which impute to another person (1) a criminal offense; (2) a loathsome disease; (3) conduct, characteristics or a condition that is incompatible with [the plaintiff's] business, trade or office; or (4) serious sexual misconduct." Biondi v. Nassimos, 692 A.2d 103, 106 (N.J. Super. Ct. App. Div. 1997).

A.

The defendants argue that Dhindhwal's statements are protected by the doctrine of qualified privilege:

> [A] communication made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable.

Bainhauer v. Manoukian, 520 A.2d 1154, 1169 (N.J. Super. Ct. App. Div. 1987) (quoting Coleman v. Newark Morning Ledger Co., 149 A.2d 193 (N.J. 1959) (internal citation and quotation marks omitted)). However, "the privilege is lost if the speaker knows the matter is false or acts in reckless disregard of its falsity." Bainhauer, 520 A.2d at 1172. The privilege is also lost if the speaker "does not act for the

purpose of protecting the interest for the protection of which the privilege is given." Id. at 1172-73.

In this case, it is a jury question whether Dhindhwal abused the privilege. There is evidence from the record that Dhindhwal recklessly disregarded the truth when he made the allegedly slanderous statements about the plaintiff. Dhindhwal testified during his deposition that, at the August 2002 meeting, he said that "somebody from Matlosz's group has come to me and said that the kind of comments Chet makes about some female colleagues could put us into trouble . . . ." (Dhindhwal Dep. at 119.) However, Radkiewicz testified at his deposition that Dhindhwal said that two women came to him and complained about the plaintiff. (Radkiewicz Dep. at 63.) Dhindhwal also testified at his deposition that he did not ask for details from the alleged informant(s). (Dhindhwal Dep. at 123, 125.) There are issues of fact as to whether Dhindhwal's statements about the plaintiff were knowingly or recklessly false. Moreover, there are issues of fact whether the statements were made for the employer's protection or rather were made out of a bad faith desire to harm the plaintiff.

B.

Dhindhwal's statements would qualify under the third category of slander per se: conduct, characteristics, or a condition that is incompatible with the plaintiff's business,

trade, or office.[7] Dhindhwal accused the plaintiff of having

potential sexual harassment claims against him. Sexual

harassment of co-workers is conduct incompatible with the

plaintiff's job and is a wrongdoing on the job. Cf. Ricciardi

v. Weber, 795 A.2d 914, 928 (N.J. Sup. Ct. App. Div. 2002)

(noting that where the plaintiff, an employer, was accused of

harassing an employee, "[t]he statements affected [the

employer] in the conduct of their trade because it went to the

essence of their character as employers.").

Accordingly, the defendants' motion for summary judgment

dismissing the plaintiff's claims of slander per se and

slander is denied.

VIII.

The plaintiff also argues that the Manual altered his at

will employment status and established an employment

agreement, and that Chase breached this agreement.

In Woolley v. Hoffman-LaRoche, Inc., 561 A.2d 1130 (N.J.

1985), the New Jersey Supreme Court held that an employee

manual may alter the employee's at will employment status.

See also Schwartz v. Leasametric, Inc., 539 A.2d 744, 749-50

---

[7] The plaintiff argues that Dhindhwal's statements also fall under the
fourth category: serious sexual misconduct. However, "[s]exual harassment
by words alone has never been deemed sexual misconduct, must less serious
sexual misconduct . . . . Rather, the category has traditionally been
limited to statements imputing unchastity, adultery, or fornication to
women." Ricciardi v. Weber, 795 A.2d 914, 928 (N.J. Sup. Ct. App. Div.
2002).

29

(N.J. Super. Ct. App. Div. 1988).  However, the court noted
that:

> if the employer, for whatever reason, does not want the
> manual to be capable of being construed by the court as a
> binding contract, there are simple ways to attain that
> goal.  All that need be done is the inclusion in a very
> prominent position of an appropriate statement that there
> is no promise of any kind by the employer contained in
> the manual; that regardless of what the manual says or
> provides, the employer promises nothing and remains free
> to change wages and all other working conditions without
> having to consult anyone and without anyone's agreement;
> and that the employer continues to have the absolute
> power to fire anyone with or without good cause.

Woolley, 99 N.J. at 309; see also Ware v. Prudential Ins. Co.,

531 A.2d 757, 760-61 (N.J. Super. Ct. App. Div. 1987)

(applying Woolley and holding that a policy manual did not

create enforceable rights where, among other things, the

employee has entered into an individual employment contract

that was terminable at will, the manual was only addressed to

a small subset of all employees, and the manual indicated that

its intent was only to delineate management responsibilities).

The plaintiff argues that, as an employee, he received a

hardcopy of the Manual, and not the Guide, and that the Manual

creates legally enforceable employment rights that protect

employees from retaliation because of harassment,

discrimination, or reporting harassment, discrimination, or

retaliation.  (Tr., dated June 30, 2005, at 52.)  The

plaintiff claims that his complaints from 2002 and 2003 fall

under these enforceable rights and are protected activities, and that Chase failed to enforce this contract and follow its own policies when it discharged him.

The defendants argue that the Manual does not establish a contract because, if construed "in accordance with the reasonable expectations of the employees," it did not create legally enforceable employment rights. Woolley, 491 A.2d at 1264. The defendants rely on the Guide which explicitly notes that "JPMorgan Chase may terminate [employees'] employment at anytime and for any reason or for no reason . . . . This Guide does not constitute or create an employment contract, establish rights, privileges or benefits of employment, or establish any job guarantee or term of employment." (Guide.)

Because it is an issue of fact whether the Guide was given to the plaintiff when he was hired and whether the disclaimer in the Guide applies to the Manual, summary judgment cannot be granted. First, the Guide states that Chase "reserves the right . . . to supplement, vary, change, suspend or eliminate any of these policies . . . ." (Id.) It is a question of fact whether, through the Manual, Chase altered the at will employment status of the plaintiff and granted him some limited employment rights. Second, the Guide's clause that the Guide "does not constitute or create an employment contract, establish rights, privileges or

benefits of employment" does not necessarily apply to the Manual because it is unclear from the evidence provided that the Manual is part of the Guide.  (Guide; <u>see</u> Manual.)  Third, it is unclear whether the plaintiff was ever given the Guide and, if he was, whether it was reasonable for the plaintiff to understand how to correctly interpret the Manual and Guide together.  Accordingly, there are unresolved issues of fact as to whether the Manual creates some enforceable employment rights under <u>Woolley</u> and, if so, what those rights are.

Accordingly, the defendants' motion for summary judgment on the breach of contract claim (Claim XI) is denied.

**CONCLUSION**

For the reasons explained above, the defendant's motion for summary judgment is **granted** for the following claims: (1) part of Claim I for retaliatory discharge based on the plaintiff's August 2002 complaints; (2) Claim II for hostile work environment under Title VII; (3) Claim III for sexual discrimination and harassment under Title VII; (4) parts of Claim VII for discrimination and hostile work environment under LAD; (5) parts of Claim VII under Whitman Executive Order No. 106.

Claims IV, V, VI and X, have been abandoned by the plaintiff, and are hereby **dismissed**.

The plaintiff's following claims **remain**: (1) Claim I for retaliatory discharge under Title VII based on the plaintiff's February 2003 complaint; (2) part of Claim VII for retaliatory discharge under the LAD; (3) Claim VIII for slander per se; (4) Claim IX for slander; and (5) Claim XI for breach of contract.

**SO ORDERED.**

**Dated:**     **New York, New York**
          **September 3, 2005**

                                 6-(Koelta
                                 _____
                                 John G. Koeltl
                                 United States District Judge

33